**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBIN HOUSTON, | ) | CASE NO. 1:25-CV-2620 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Robin Houston's application for a period of disability and Disability Insurance Benefits (DIB). Ms. Houston seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Dec. 3, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In March 2023, Ms. Houston applied to the Social Security Administration (SSA) seeking a period of disability and DIB benefits. (*See* Tr. 1814.)[1] She claimed that she became disabled on March 22, 2022. (*See id.*) She identified sixteen allegedly disabling conditions: (1) stiff person spectrum disorder; (2) chronic full neck pain; (3) degenerative arthritis of the lumbar spine; (4) "joint and muscle whole body"; (5) muscle weakness whole body; (6) peripheral vascular

[1] The administrative transcript appears at ECF No. 9. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 65"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 10") and page-identification numbers (e.g., "PageID# 2785").

disease; (7) muscle/skeletal pain upper left extremity; (8) migrainous vertigo; (9) positive GAD antibody; (10) chronic fatigue; (11) hyperCKemia; (12) balance and coordination issues and problems; (13) muscle cramps and spasms; (14) pernicious anemia; (15) adjustment disorder with mixed anxiety and depression; and (16) hypertension. (Tr. 1883.)

The SSA denied Ms. Houston's application initially and upon reconsideration. (Tr. 1727, 1735, 1744, 1746.) Ms. Houston requested a hearing with an ALJ. (Tr. 1747.) The ALJ held a hearing on September 4, 2024, at which Ms. Houston proceeded without representation. (Tr. 70–97.) Ms. Houston testified, as did an independent vocational expert (VE). (*Id.*)

On October 21, 2024, the ALJ issued a written decision finding that Ms. Houston was not disabled. (Tr. 48–65.)

Ms. Houston sought review with the SSA Appeals Council, which denied review in September 2025, rendering the ALJ's decision the Commissioner's final decision in the matter. (Tr. 5.) Ms. Houston then received an extension from SSA to seek judicial review. (Tr. 1.)

On December 2, 2025, Ms. Houston filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Houston raises a single assignment of error for review:

> The Commissioner erred as a matter of law by failing to account for any mental limitations in the RFC, and by failing to expressly explain why such limitations were not included in the RFC.

(Pl.'s Merit Br. at 8, ECF No. 10, PageID# 2785.)

## III. BACKGROUND[2]

### A. Personal, Educational, and Vocational Experience

Ms. Houston was born in April 1960 and was 62 years old on the date of her application. (Tr. 80, 1814.) She graduated from high school and obtained an associate degree in applied sciences. (Tr. 81.) She last worked in 2022 or early 2023, as a medical receptionist. (Tr. 81–82.) Before that, she worked part-time at a retail store doing employee onboarding, some retail sales, and processing returns. (Tr. 85.) She has a driver's license and is able to drive, although sometimes she is hesitant to do so because "[s]ometimes [her] body feels heavy" and she has trouble moving. (Tr. 81.)

Ms. Houston is married and lives with her husband. (Tr. 80.)

### B. Function Reports

On March 29, 2023, Ms. Houston filled out a function report in support of her disability application. (Tr. 1898–1905.)

On a typical day, after Ms. Houston wakes up, she will shower and put comfortable clothes on, make tea, eat breakfast, make her bed, and then pick a task to accomplish that day. (Tr. 1899.) She typically spends time each day crying, sleeping, trying to keep heating pads on her body, taking medication, and looking out the window "try[ing] to understand what is wrong with [her]." (*Id.*) She wakes up in pain in the middle of the night and has a hard time getting back to sleep. (*Id.*)

---

[2] Ms. Houston confines her assignment of error to her mental health impairments and related limitations. (*See* Pl.'s Merits Br. at 8, ECF No. 10, PageID# 2785.) Thus, especially in light of the extensive record in this case, I focus my summary on the evidence the parties have identified as related to Ms. Houston's mental health impairments and related limitations. Additionally, I note that Ms. Houston cited several medical records in the argument section of her brief without including a substantive discussion of the medical record evidence in the facts section. Plaintiff's counsel is reminded of their obligation to "identify in their briefs all the evidence they believe to be relevant to their claims or defenses," and is further reminded that "[a]ny facts relied upon in the argument or analysis section of a brief must be set forth in the facts section." (Magistrate Judge's Initial Order, ECF No. 6, PageID# 29.) Finally, I note that "it is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017).

Ms. Houston described that she needs medication to manage her pain, but the medication causes side effects including fatigue, drowsiness, depression, poor concentration, and balance problems. (Tr. 1898.) Overall, Ms. Houston does not feel like the same person she previously was; she feels as though "something has taken over [her] body and mind." (*Id.*)

Ms. Houston has trouble dressing, especially doing buttons, because she is "very shaky." (Tr. 1899.) She can only take showers because baths cause cramping and spasms. (*Id.*) She is able to feed herself, but she does not like eating around others because she is self-conscious about her shaking. (*Id.*) She sometimes needs help using the toilet because of bad spasms. (*Id.*) The range of motion in her neck is very limited, and she finds herself in "some sort of pain all day every day." (*Id.*)

Ms. Houston cooks meals three days a week, and doing so takes her around 20 to 30 minutes. (Tr. 1900.) But she does not enjoy cooking because she is clumsy, nervous, fatigued, and forgetful. (*Id.*) She is able to complete household chores if she "pace[s]" herself. (*Id.*) She picks one chore per day, and completing that chore takes two or three hours. (*Id.*)

Ms. Houston is able to drive and ride in a car, and she goes outside around once a week. (Tr. 1901.) She does not go out alone because she is afraid of spasms and because of her medication side effects. (*Id.*) She shops for food and household items once every other week for about an hour at the store. (*Id.*) Paying bills causes her to have an anxiety attack, but she is able to pay bills. (*Id.*) She is able to use a checkbook and count change, but she is forgetful so she is afraid that she will "make a huge mistake." (*Id.*)

Ms. Houston enjoys gardening, but she has not done so in the past couple years because of her limitations. (Tr. 1902.) She feeds, plays with, and holds the family pet. (Tr. 1899.) She socializes with her adult daughter over the phone every other day, and in person around once a

week. (Tr. 1902.) She does not go other places on a regular basis. (*Id.*) She does not like being around other people because she feels embarrassed, and she does not like being on the computer or the internet. (*Id.*)

Ms. Houston wrote that she cannot pay attention for very long, as she "stay[s] in a fog." (Tr. 1903.) She finds that her mind wanders. (*Id.*) She often does not finish the tasks she starts. (*Id.*) She follows written instructions fairly well, and she follows spoken instructions somewhat well (though not as well as she used to). (*Id.*) She gets along "fine" with authority figures. (*Id.*) She cannot handle stress at all, as stress causes her to have anxiety and "severe spasms in [her] neck, shoulder [and] arms." (Tr. 1904.)

## C. <u>Relevant Hearing Testimony</u>

### *1. Ms. Houston's Testimony*

Ms. Houston testified that she began to experience "skeletal pain throughout [her] body" when she worked at a retail store in a position that involved a lot of standing and walking. (Tr. 82.) She noticed that she would have spasms in her neck that would radiate down her arms. (*Id.*) She then left that position and tried sedentary work as a medical receptionist, but the stress of the job continued causing spasms and pain. (*Id.*)

Her pain medication allows her to fall asleep now, but she finds herself waking up due to pain. (Tr. 83.) She feels fatigued and has skeletal pain in her neck, arms, and hands throughout the day. (*Id.*) She has been having more muscle pain recently, and she was diagnosed with a pinched nerve. (*Id.*) She has trouble with grip strength. (Tr. 84.)

Ms. Houston described that she "used to be a pretty good, smart, articulate person" but now finds it hard to find the right words, so she does not talk much at all. (*Id.*) When she changed doctors and had to explain her symptoms "all over again," she felt very depressed. (*Id.*)

She worked for 12 years answering phone calls for a hospital system, but she left that job because it grew too stressful for her and she was having muscle spasms. (Tr. 86–87.)

Ms. Houston does not believe that she could work, even at a call center, because sitting itself is painful for her now. (Tr. 87.) Additionally, her medication makes her "loopy and drowsy," and she is fatigued for most of the day. (*Id.*) Her memory is poor. (*Id.*) Her memory troubles have gotten bad in the past couple years, and she is "in pain 24/7." (Tr. 88.) She finds that she lacks the attention "for anything," and nothing excites her anymore, not even her pet dog. (*Id.*)

Ms. Houston described that on a typical day, she will wake up and make coffee and then sit for a while with her legs elevated. (Tr. 89.) She will take a nap in the morning, until she is awoken by pain. (*Id.*) She is often awoken by pain in the middle of the night, too. (*Id.*) She does not do any chores. (*Id.*) She will sit outside with the dog, and sometimes her father comes to visit her. (Tr. 89–90.) But she does not like to leave the house. (Tr. 90.)

Ms. Houston was in psychotherapy until her insurance stopped covering that treatment. (*Id.*) She found therapy to be helpful. (*Id.*)

Ms. Houston testified that all of her fingers hurt, and she had a "trigger thumb" on her left hand before an injection helped it. (Tr. 91–92.) Her right thumb has also twisted and hurts her badly. (*Id.*) Her skeletal pain can present "anywhere," like in her arms, calves, hips, or ankles. (Tr. 92.) Ms. Houston takes diazepam, which helps control her spasms but does not help her pain. (*Id.*)

### 2. *Vocational Expert's Testimony*

Rachel McDaniel testified as a vocational expert (VE) at the hearing. (Tr. 93, 1967.) She classified Ms. Houston's past relevant work, testifying that Ms. McDaniel worked for two different

employers, as a receptionist (DOT 237.367-038) for one and as a cashier supervisor (DOT 211.137-010) for the other. (Tr. 94–95.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Houston's age, education, and work experience had the capacity to perform work at the light exertional level, with additional limitations. (Tr. 95.) Specifically, the person can never climb ladders, ropes, or scaffolds. (*Id.*) They can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) They must avoid dangerous heavy moving machinery and unprotected heights. (*Id.*) They can frequently handle with the dominant left upper extremity. (*Id.*)

The VE testified that such a person could perform Ms. Houston's past relevant work, both generally and as Ms. Houston actually performed it. (Tr. 96.)

The ALJ next asked the VE to further limit the hypothetical worker to work at the sedentary exertional level. (*Id.*) The VE confirmed that such a person would still be able to perform Ms. Houston's past relevant work, both generally and as actually performed. (*Id.*)

The VE testified that employers will tolerate some time off task, up to ten percent, but the greater the SVP, the greater the flexibility." (*Id.*) One absence per month is allowed, but anything more frequent would preclude competitive employment. (*Id.*)

**D. <u>State Agency Consultants</u>**

A disability examiner (Sarah Blake), a physician (Mehr Siddiqui, M.D.), and a psychologist (Kiela Bolden, Psy.D.) reviewed Ms. Houston's claim at the initial review level in August 2023. (Tr. 1727–35.)

Dr. Bolden reviewed the record and opined that Ms. Houston's mental impairments were non-severe. (Tr. 1731.) Dr. Bolden found mild limitations in Ms. Houston's ability to understand, remember, or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage herself. (*Id.*) Dr. Bolden explained that, while Ms. Houston has a history

of adjustment disorder and reports some difficulties, the medical evidence "does not indicate[] any mental status abnormalities." (*Id.*)

Based on this opinion and the physical residual functional capacity opinion of Dr. Siddiqui, the consultants determined that Ms. Houston could return to her past relevant work as a receptionist and was not disabled. (Tr. 1735.)

In a letter to Ms. Houston explaining this decision, the Agency wrote that the medical evidence showed that her "mental conditions do not impose more than a minimal limitation upon [her] work-related functional capacity." (Tr. 1753.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Michael McKinley), physician (Gail Mutchler, M.D.), and psychologist (Sylvia Chen, Ph.D.) in March 2024. (Tr. 1736–46.)

Dr. Chen agreed that the record did not support the finding of a severe mental health impairment. (Tr. 1738.) She agreed that there were mild limitations with respect to the Paragraph B criteria. (Tr. 1729.) Dr. Chen explained that the initial-level evidence, in addition to the records received at the reconsideration level, did not "consistently support the degree of functional limitations alleged." (Tr. 1740.) While Ms. Houston had a history of prescriptions for mood related symptoms, her medical records did not reflect any significant psychological impairments during visits and February 2024 consulting examination found no more than mild limitations. (*Id.*) Dr. Chen concluded that Ms. Houston had a history of psychological related symptoms that were exacerbated by her physical problems and pain, "but there are no current limitations present indicative of severe mental or psychiatric impairment . . . ." (*Id.*)

Based on this opinion and Dr. Mutchler's opinions about Ms. Houston's physical limitations, the consultants agreed with the initial level findings that Ms. Houston could return to her past relevant work and was not disabled. (Tr. 1744.)

In a letter to Ms. Houston explaining this decision, the Agency wrote that the medical evidence showed that she has "symptoms of depression and anxiety, which limits [her] ability to interact and adapt," but that she is "still able to perform basic work duties, including work [she] ha[s] done in the past." (Tr. 1758.)

### E. <u>Relevant Medical Evidence</u>

Ms. Houston consulted with Alicia Jones, D.O., in March 2022, for an annual primary care appointment. (Tr. 2257, 2259.) Ms. Houston complained of muscle cramps and other physical ailments, and she endorsed fatigue. (Tr. 2259.) She said that she had been irritable at work and ultimately left her work due to anxiety. (*Id.*) She said she was having a hard time with her new part-time job because of "poor focus and brain fog." (*Id.*) She identified that her depression and anxiety made it "extremely difficult" for her to do her work, take care of things at home, or get along with others. (*Id.*) On examination, Ms. Houston presented as pleasant; she was alert, oriented, and displayed intact recent and remote memory. (Tr. 2262.) Her mood and affect were normal. (*Id.*)

In interpreting Ms. Houston's depression and anxiety screening scores, Dr. Jones would later write that Ms. Houston "has some anxiety and [a positive] depression screening[,] but I think this is more so due to her pain and symptoms." (Tr. 2256.)

Dr. Jones decided to trial Ms. Houston on "a very low dose" of a selective serotonin reuptake inhibitor "to see if this help[s]." (*Id.*)

Ms. Houston followed up with Dr. Jones on September 28, 2022. (Tr. 2249.) Ms. Houston had been started on diazepam by another provider in the interim, which Ms. Houston said was

helping with her spasms but was causing her to awaken fatigued. (Tr. 2251.) On examination, Ms. Houston was again noted to be pleasant with a normal psychiatric status. (Tr. 2254.)

In October 2022, Ms. Houston met with Allen Segal, D.O., on a referral from Dr. Jones to follow up regarding her muscle cramps. (Tr. 2418–19.) Ms. Houston reported that the diazepam had reduced her spasms from daily severe spasms to mild ones. (Tr. 2419.) But she was feeling dizzy and was having “crazy dreams.” (*Id.*) She described her mood as better and her overall functioning as better. (Tr. 2419–20.) But she reported that her anxiety had increased recently. (Tr. 2420.) On examination, her judgment and insight were intact; she was oriented to person, place, and time; and her mood and affect were normal. (Tr. 2424.)

Ms. Houston followed up with Dr. Jones in January 2023. (Tr. 2053.) Ms. Houston said that she was “up and down” emotionally. (Tr. 2055.) She described physical pain and said that she felt that she was “not [her] anymore” and does not look forward to anything. (*Id.*) She said her dog made her feel better, and Dr. Jones affirmed that the dog could qualify as an emotional support animal. (Tr. 2054.) On examination, Ms. Houston’s psychiatric functioning was normal, but she presented with a flat, saddened, and tearful mood and affect. (Tr. 2059.) Dr. Jones increased the dosage of Ms. Houston’s SSRI and placed a referral to see a psychology or psychiatry team. (Tr. 2054.)

Ms. Houston consulted with Dr. Jones again in April 2023. (Tr. 2239.) Ms. Houston had begun counseling. (Tr. 2241.) On examination, Ms. Houston presented as pleasant with a normal mood, affect, and psychiatric condition. (Tr. 2240–41.) She was directed to continue with counseling. (Tr. 2241.)

At counseling appointments in April 2023, Ms. Houston reported feeling hopelessness, sadness, and low motivation and described her physical condition. (Tr. 2101, 2104, 2107.) Her mental status examination was within normal limits. (Tr. 2100, 2103, 2106.)

When Ms. Houston followed up with Dr. Jones in August 2023, she reported that she had been without a counselor for three weeks, and she said that her anxiety and depression had worsened. (Tr. 2238.) Her mental status examination was normal, and she was again noted to be pleasant. (*Id.*)

In February 2024, Ms. Houston met with a counselor in a telehealth appointment to establish behavioral health care. (Tr. 2282.) She described that her physical pain impacts her mood and said that her anxiety and depression symptoms had increased over the past few years. (*Id.*) She endorsed depression symptoms including fatigue, feelings of hopelessness, diminished interest in activities, and poor concentration. (Tr. 2283.) She endorsed anxiety symptoms including restlessness, feeling easily fatigued, difficulty concentrating, muscle tension, and sleep trouble. (*Id.*) On examination, Ms. Houston was cooperative and oriented with clear speech, logical thought processes, and good judgment and insight. (Tr. 2285.) She had good memory, was able to maintain sustained concentration, and presented with a euthymic mood with congruent affect. (*Id.*) Ms. Houston was recommended for individual behavioral health counseling services. (Tr. 2286.)

Ms. Houston underwent a psychological consulting evaluation for purposes of her disability application on February 22, 2024, with Herschel Pickholtz, Ed.D. (Tr. 2268–76.) Dr. Pickholtz assessed that Ms. Houston's pace and persistence during the examination were average. (Tr. 2270.) Ms. Houston reported that, on psychiatric medication, she "experiences minimal affective symptoms," which she described as mild depressive symptoms occurring for a few hours twice a month. (*See id.*) Ms. Houston reported moderate anxiety symptoms, but she again

described that she only experienced symptoms twice per month, lasting about three minutes per occurrence. (*Id.*; *see also* Tr. 2273 ("only lasts for about 3 minutes until it dissipates")). Dr. Pinkholtz assessed that the quality and quantity of Ms. Houston's responses during the clinical interview fell between the low average and average ranges. (Tr. 2272.) The quality and quantity of responses during the cognitive section fell within the upper part of the low average range. (*Id.*) Her overall capacities for associative thinking and cognitive levels of functioning fell between the upper end of the low average range to the average range. (Tr. 2272.)

Dr. Pinkholtz opined that Ms. Houston's psychiatric conditions "suggest a slight to somewhat of an impairment at worst but does not appear to be severe with her major impediment ascribed to her physical problems." (Tr. 2275.) He opined that Ms. Houston had no impairment with respect to her overall capacity to understand, remember, and carry out instructions for simple work activities. (*Id.*) She had a slight impairment in this capacity with respect to more complex work activities. (*Id.*) There was a slight impairment in Ms. Houston's capacity to relate to coworkers and others. (*Id.*) Her capacity to handle the stress and pressures of work was slightly or somewhat impaired "at worst," but Dr. Pinkholtz assessed that it "does not appear to be severe as long as she continues on with her psychiatric treatment protocol." (Tr. 2276.)

At a counseling appointment in April 2024, Ms. Houston described that her physical symptoms had "caused some anxiety." (Tr. 2280.) She reported being easily distracted and said she had difficulty remembering things. (Tr. 2281.) On examination, she was well groomed and cooperative, presenting with a euthymic mood and a full affect. (Tr. 2280–81.) She was oriented, and no abnormal thought processes were noted. (Tr. 2281.)

## IV. THE ALJ'S DECISION

The ALJ determined that Ms. Houston meets the insured status requirements of the Social Security Act through March 31, 2027. (Tr. 54.) The ALJ next determined that Ms. Houston had

engaged in substantial gainful activity after the alleged disability onset date, but that there was a continuous twelve-month period during which she did not work at substantial gainful activity levels during the relevant alleged disability period. (*Id.*)

The ALJ next determined that Ms. Houston had severe impairments of (1) cervical spine impairment and (2) left trigger finger. (*Id.*) The ALJ further found that Ms. Houston had non-severe impairments of hypertension, hypothyroidism, and vitamin D deficiency. (*Id.*) The ALJ found that Ms. Houston had non-severe mental impairments of generalized anxiety disorder, adjustment disorder, depression, and personality disorder. (Tr. 55.) The ALJ stated that any limitations stemming from these impairments were incorporated into the residual functional capacity. (Tr. 57.)

The ALJ next determined that none of Ms. Houston's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 58.)

The ALJ determined that Ms. Houston had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 59.) Specifically, she can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. (*Id.*) She can occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) She must avoid dangerous heavy moving machinery and unprotected heights. (*Id.*) She can frequently handle with the dominant left upper extremity. (*Id.*)

The ALJ found that Ms. Houston could perform her past relevant work as a receptionist (DOT 237.367-038), a semi-skilled sedentary position. (Tr. 64–65.) The ALJ concluded that she could perform the work as generally performed and as actually performed. (*Id.*) Accordingly, the ALJ determined that Ms. Houston is not disabled. (Tr. 65.)

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations

direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. Analysis

In her sole assignment of error, Ms. Houston argues that the ALJ erred when she concluded that Ms. Houston had mild non-exertional limitations when discussing the Paragraph B criteria at Step Two but then did not include any non-exertional limitations in the RFC. She says that the ALJ also erred by failing to explain that decision when discussing how the ALJ developed the RFC. She points out that the ALJ found non-severe impairments of generalized anxiety disorder,

adjustment disorder, depression, and personality disorder, with accompanying mild limitations in the Paragraph B criteria, yet the ALJ did "not include a single mental limitation" in the RFC. She contends that the ALJ's failure to explain that decision when developing the RFC violates SSR 96-8p and prevents the Court from tracing the ALJ's reasoning on the issue. *See* SSR 96-8p, 1996 WL 374184 at *4 ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ."). Finally, she points out that the ALJ found Dr. Pinkholtz's opinion only partially persuasive, disagreeing with Dr. Pinkholtz that the evidence supported a conclusion that Ms. Houston had no impairment at all with respect to her capacity to understand, remember, and carry out simple work activities. (Tr. 57.) The ALJ concluded that "[a] mild limitations is better supported." (*Id.*) Ms. Houston argues that the ALJ's findings in this regard are inconsistent with a finding that she has no functional mental limitations in the RFC.

The Commissioner defends the ALJ's decision, arguing first that an ALJ is not required to include functional limitations to account for mild limitations with respect to the Paragraph B criteria from Step Two. He further argues that it is not reversible error for the ALJ to have discussed the Step Two and RFC findings at the same time where the discussion and conclusions are adequate and supported by substantial evidence. He contends that the ALJ's reliance on the state psychological consultants provides further support for the ALJ's conclusions and chain of reasoning.

In reply, Ms. Houston again emphasizes that the ALJ did not include a discussion of her mental health impairments when developing the RFC, which she contends is error notwithstanding the discussion at Step Two.

After careful consideration, I agree with the Commissioner that the ALJ did not commit reversible error here and that the ALJ's conclusions with respect to Ms. Houston's mental health conditions and limitations are supported by substantial evidence.

It is true that the ALJ did not discuss Ms. Houston's mental conditions or limitations in the section of her decision wherein she develops the RFC. (*See* Tr. 59–64.) In that section of the decision, the ALJ does not discuss Ms. Houston's allegations with respect to her mental limitations, any of the medical records related to her mental health, or any of the opinion evidence concerning Ms. Houston's mental status or non-exertional functional limitations. (*See id.*) It would have been preferable for the ALJ to have included the detail from her Step Two discussion in this section of the decision, or at least have referenced her previous discussion and incorporated it by reference here.

But "the regulations do not require the ALJ to issue a perfect decision." *Merrell v. Comm'r of Soc. Sec.*, No. 1:20 CV 769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). While an ALJ must provide sufficient analysis of the evidence of record for the Court to trace the ALJ's reasoning, a reviewing court reads the ALJ's decision as a whole. *See, e.g.*, *Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021).

Here, I agree with the Commissioner that "[t]here is no question" that the ALJ's analysis of Ms. Houston's mental conditions and limitations at Step Two would be sufficient if it had been included in the ALJ's discussion of the RFC.

The ALJ carefully considered Ms. Houston's mental health diagnoses, her treatment history, her subjective statements about her conditions, her activities of daily living, and the opinion evidence relevant to her mental health across three pages. (Tr. 55–57.) Among other things,

the ALJ, citing medical records, concluded that the overall record contains "generally unremarkable psychological and mental status examination findings." (Tr. 55.) The ALJ cited the consulting examiner's opinion that Ms. Houston's overall capacities for associative thinking and cognitive functioning fell between the upper end of the low average to the average ranges. (*Id.*) The ALJ noted that, at the hearing, Ms. Houston did not appear to have difficulty answering questions. (*Id.*) With respect to activities of daily living, the ALJ pointed out that Ms. Houston resides with her spouse, sees her children twice a week, and was noted to get along with the people in her neighborhood and community. (*Id.*) The ALJ acknowledged those times where Ms. Houston was presented to appointments with a flat, sad, depressed, tearful, or constricted affect or mood. (Tr. 56.) But the ALJ pointed out that otherwise, her mental status examination findings were generally unremarkable and she often presented with a normal or euthymic and full range mood and affect. (*Id.*)

Ms. Houston does not point to any inaccuracy in the ALJ's summary of the record evidence.

The ALJ then went on (again, at Step Two), to consider the opinion evidence. The ALJ noted that the state psychological consultants opined that the claimant has only mild limitations in all areas of mental functioning, an opinion that the ALJ found persuasive. (Tr. 56.) The ALJ considered the consulting examiner's opinion, finding it persuasive in that the examiner found only slight impairments in Ms. Houston's capacity to understand, remember, and carry out instructions for more complex work activities; her abilities to perform 3 to 4 step tasks; her capacity to relate to coworkers and others; and in her capacity to handle the stresses and pressures of work. (Tr. 57.) The ALJ found the opinion partially unpersuasive, but only to the extent that the examiner opined that Ms. Houston had no impairment whatsoever with respect to her capacity to understand,

remember, and carry out simple instructions and perform one- to two-step tasks. (*Id.*) Here, the ALJ found "[a] mild limitation . . . better supported." (*Id.*)

Here again, Ms. Houston does not particularly disagree with the ALJ's conclusions with respect to the evidence or these opinions, and she points to no professional opinion stating a specific functional limitation stemming from her mental health conditions.

Ms. Houston's argument is instead that the ALJ, having engaged in this discussion at Step Two, having found mild limitations in the Paragraph B criteria, and having noted that "[t]he limitations identified . . . are not a residual functional capacity assessment" and that "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment" (Tr. 57), erred by not re-engaging in an analysis of her mental impairments and limitations later in the sequential evaluation. (*See* Reply at 2, ECF No. 12, PageID# 2808.)

The question then becomes: where the ALJ engaged in a fulsome and accurate discussion of the record medical and opinion evidence at Step Two and came to the conclusion that Ms. Houston has mild limitations in the Paragraph B criteria, and where that conclusion is supported by substantial evidence, did the ALJ err when she did not include specific functional limitations in the RFC and when she did not re-engage in the analysis when developing the RFC?

Here, I again agree with the Commissioner that the satisfactory nature of the ALJ's thorough discussion of Ms. Houston's mental health conditions "does not change because [that discussion] is not located in a particular section" of the decision.

As the Commissioner points out, a Court in this district confronted a very similar argument in *Avers v. Kijakazi*, No. 3:20-cv-01433, 2021 WL 4291228, *9–11 (N.D. Ohio Sept. 21, 2021). There, as here, the ALJ found mild limitations in the Paragraph B criteria at Step Two and chose

not to include any functional limitations in the RFC. And there, as here, the ALJ's decision appeared "to discuss the Step Two and Step Four findings at the same time." *Id.* at *11. Nevertheless, the Court rejected the claimant's argument that there was reversible error, reasoning first that "[t]he reasonable inference is that non-severe mental limitations do *not* impact the RFC." *Id.* at *11 (emphasis in original). The Court, collecting cases, further found that an ALJ's determination that she had some mild impairment does not require automatically require inclusion of mental limitations in the RFC. *Id.* (collecting cases). The Court noted that the ALJ's decision in their particular case was supported by substantial evidence where, among other things, the ALJ relied on the state agency psychologists' opinions finding the claimant's mental impairments non-severe and where the ALJ discussed activities of daily living that showed the lack of mental functional limitations. *Id.* at *11–12. Finally, the Court held that the ALJ's discussion of the Step Two and RFC factors together "alone is not cause for remand." *Id.* at *11.

The case is instructive, and I find that the same reasoning applies here.

First, Ms. Houston does not dispute that mild Paragraph B findings need not automatically be included in the RFC. (*See* Reply at 3, ECF No. 12, PageID# 2809); *see also Cameron v. Comm'r of Soc. Sec.*, No. 1:23-cv-1371, 2024 WL 406940, at *4–5 (N.D. Ohio Jan. 18, 2024), *report and recommendation adopted*, 2024 WL 404488 (N.D. Ohio Feb. 2, 2024).

Second, while the ALJ acknowledged in her Step Two discussion that Step Two findings are not equivalent to an RFC assessment, it is abundantly clear—reading the decision as a whole and with common sense—that the ALJ intended her Step Two discussion to meet the more detailed requirements of an RFC assessment. The discussion is uniquely detailed for a Step Two analysis, including in that the ALJ discussed the relevant opinion evidence here as opposed to later in the decision. In other words, this is not a case where an RFC analysis "is completely devoid of any

discussion concerning a claimant's mental impairments." *Avers*, 2021 WL 4291228, at *11. This is a case where the ALJ "discuss[ed] the Step Two and Step Four findings at the same time," which "alone is not cause for remand." *Id.*

While Ms. Houston attempts to distinguish *Avers*, saying that here the Commissioner is asking the Court "to supply a missing Step 4 RFC analysis from a Step 2 discussion the ALJ herself disclaimed as not constituting an RFC assessment," I find that argument unpersuasive. It would be unreasonable to reverse solely because the ALJ did not copy and paste her detailed discussion of Ms. Houston's mental impairments at Step Two when crafting the RFC. Such a decision would contradict this District's longstanding practice of reading ALJ decisions as a whole and with common sense. *Taylor*, 2021 WL 4477865, at *8.

The non-binding cases Ms. Houston musters in support of her position do not compel a different result.

In *Richardson v. Saul*, 511 F. Supp. 3d 791, 798 (E.D. Ky. 2021), a non-binding decision from another district, the court held that it was error for an ALJ to include no mental limitations in the RFC under the facts of the case. *Id.* at 798–99. The case is distinguishable for at least two reasons.

First, the claimant in *Richardson* specifically argued that his mental limitations "would actually preclude his ability to perform" his past relevant work. *Id.* at 798. Ms. Houston, while pointing out that her past relevant work was skilled work at an SVP 4, she does not suggest a single specific functional limitation she wishes had been included in the RFC. The closest she gets is a perfunctory argument that "[h]ad the hypothetical to the VE reflected *mild* mental limitations, she **may have been** precluded from her past relevant work and found disabled . . . ." (Reply at 4, ECF No. 12, PageID# 2810) (italics in original, bold emphasis added).

Second, and more importantly, the ALJ in *Richardson* found only mild limitations at Step Two and did not include any mental limitations in the RFC (without explanation), despite stating that the ALJ gave "great weight" to a consulting opinion concluding that there were "mild **to moderate**" mental limitations. *Richardson*, 511 F.Supp.3d at 799. The court specifically noted that that opinion "particularly opined that Richardson faced mild to moderate limitations regarding social interaction and adaptation to a normal work environment." *Id.* The court found that, where the ALJ found that opinion persuasive, it was error for the ALJ to include "not a whisper about such non-exertional factors." *Id.*

Here, in contrast, there is no such unexplained contradiction between the ALJ's RFC assessment and her findings with respect to the record or opinion evidence. Ms. Houston attempts to paint a contradiction, pointing out that the ALJ found Dr. Pinkholtz's opinion unpersuasive in part. But the ALJ's disagreement with Dr. Pinkholtz was relatively minor—she found that Ms. Houston had a mild limitation in her ability to complete simple tasks. The ALJ's decision not to incorporate mental limitations in the RFC was supported by the opinions of the state agency psychological consultants, who both opined that her mental health conditions were non-severe and that she had no functional limitations affecting her ability to work (Tr. 1731, 1738, 1740), and it was also supported by the opinion of Dr. Pinkholtz, who also opined that her conditions were non-severe. (Tr. 2275.)

The same factor distinguishes *Johnson v. Comm'r of Soc. Sec.*, No. 3:20-CV-99, 2021 WL 5177818, at *3 (S.D. Ohio Nov. 8, 2021), another out-of-district opinion upon which Ms. Houston relies. In *Johnson*, the ALJ gave "great weight" to a consulting opinion that stated the claimant was capable of superficial interaction but would work best in solitude. *Id.* The ALJ, without explanation, limited the claimant to occasional interaction without addressing any difference

between "occasional" and "superficial" and without addressing the opinion with respect to working in solitude. *Id.* Here, again, the ALJ's RFC determination was not inconsistent with any psychological opinion in a way that was unexplained. To the contrary, the Court can readily trace the ALJ's reasoning with respect to her mental health limitations (albeit by looking to the discussion at Step Two).

And the same error was at the heart of *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018) ("[W]here, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so."), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019). Again, the case at bar presents no such situation.

In *Rogers v. Berryhill*, No. 16-CV-6349-FPG, 2017 WL 3483666 (W.D.N.Y. Aug. 15, 2017), the ALJ found a non-severe mental impairment at Step Two, but the ALJ failed to include any mental limitations in the RFC. *Id.* at *4. The court found error where the ALJ's RFC analysis did not discuss the claimant's depression or anxiety "or explain why the RFC lacked any related mental limitations." *Id.* Here, in contrast, the ALJ's discussion of Ms. Houston's mental health conditions went far beyond a simple "boilerplate statement" that she considered those impairments when crafting the RFC. *See id.* While the ALJ included this discussion at Step Two, she thoroughly discussed Ms. Houston's mental health conditions and limitations, as discussed further above.

Here, while the ALJ stated her Step Two and RFC findings together, it is clear that the ALJ "consider[ed] all of [her] impairments" when crafting the RFC. *See Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013). Ms. Houston does not substantively dispute that the ALJ's conclusions with respect to her mental health limitations were supported by substantial

evidence, citing few medical records in support of her position.[3] She identifies no specific functional limitations she wishes had been included in the RFC, let alone direct the Court to any medical opinion stating a more restrictive RFC. The RFC is supported by the opinions of the state psychological consultants and the consulting examiner, and the ALJ accurately summarized the medical record evidence in coming to her conclusions in the case. While Ms. Houston would like to have had *some* limitation included in the RFC, she does not dispute that an ALJ is not automatically required to include in an RFC any of the ALJ's mild Paragraph B findings. *E.g.*, *Cameron*, 2024 WL 406940, at *4–5.

Ms. Houston's central complaint with the ALJ's reasoning is that she only included it at Step Two and did not repeat it when developing the RFC. But where the ALJ's discussion clearly shows that she considered Ms. Houston's non-severe mental impairments when developing the RFC, and where the ALJ's conclusions are supported by substantial evidence, the fact that the ALJ "discuss[ed] the Step Two and Step Four findings at the same time" is "alone is not cause for remand." *Avers*, 2021 WL 4291228, at *11.

Therefore, I am convinced that the ALJ adequately explained her decision not to include mental limitations in the RFC and rendered a decision supported by substantial evidence.

As there is no basis to reverse or remand in this case, I recommend that the Court overrule Ms. Houston's assignment of error and affirm the Commissioner's decision.

---

[3] Ms. Houston cites the consulting examination, which I have discussed at length here. She further cites her function report; one treatment note from March 2022 in which she complained of anxiety and depression and was started on a very low dose of an SSRI (Tr. 2258, 2256); and a treatment note from October 2022 in which she said her anxiety was "up" but during which her mental status examination was normal (Tr. 2180, 2184).

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: October 5, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).